**FORD MOTOR COMPANY, a Delaware Corporation**

v.

**J. A. PLASTERER, Sr., and J. A. Plasterer, Jr., co-partners, trading as J. A. Plasterer & Son.**

**Civ. A. 5505.**

United States District Court
M. D. Pennsylvania.

May 17, 1957.

Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for plaintiff.

Nolan F. Ziegler, Richard Eisenhour, Harrisburg, Pa., for the defendant.

**FOLLMER, District Judge.**

This suit was instituted by Ford Motor Company, a Delaware corporation, against J. A. Plasterer, Sr., and J. A. Plasterer, Jr., copartners, trading as J. A. Plasterer & Son, defendants. Upon consideration of the pleadings, the testimony of witnesses taken orally before the Court, the exhibits offered by the respective parties, the stipulations of the parties, and the briefs and oral arguments of counsel of the respective parties, the Court makes the following

## Findings of Fact

1. Plaintiff, Ford Motor Company, has been and now is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware and a citizen and inhabitant of said State.

2. J. A. Plasterer, Sr. and J. A. Plasterer, Jr. have been and now are copartners doing business as J. A. Plasterer & Son and have their principal place of business in the Borough of Highspire, County of Dauphin, and Commonwealth of Pennsylvania, where they have been and now are engaged in the automobile sales, service and repair business.

3. The amount in controversy and dispute herein exceeds the sum and value of $3,000., the good will pertaining to the business of the Ford Motor Company being far in excess thereof.

4. Plaintiff and defendant duly entered into a "Ford Sales Agreement" on August 8, 1940, which agreement was amended on August 5, 1949 in particulars not herein relevant.

5. The pertinent provisions of said agreement are as follows:

"(10) (c) That, on termination of this agreement, Dealer will immediately remove, at Dealer's expense, all Ford signs from Dealer's place of business and discontinue all advertising of Company products.

" *     *     *     *     *     *

"(f) That, in event of termination of this agreement by Company, Company shall repurchase immediately from Dealer and Dealer agrees to sell to Company all new and undamaged genuine Ford, Mercury,

Lincoln and Lincoln-Zephyr parts and approved accessories purchased from Company by Dealer after the sixtieth day prior to date of giving notice of intention to terminate this agreement at the prices paid for such parts by Dealer less ten per cent (10%) and less transportation charges thereon from Dealer's place of business to Company's branch under which Dealer operates provided such parts and accessories are in first class saleable condition. Dealer also agrees to carefully pack and box at Dealer's own expense and ship to Company all parts and accessories which Company repurchases under the terms of this subparagraph (f). In case Dealer fails to so box and ship such goods, Company may do so and deduct the expenses thereof from the repurchase price. In event of termination of this agreement by either Dealer or Company, Company may at its option examine the stock of Dealer and select any such genuine parts and approved accessories that Dealer may have at the time of termination and Company shall have the right and option to repurchase on like terms such genuine parts and approved accessories, whether or not damaged as the Company in its absolute discretion may elect."

6. Ford Motor Company by due and proper notice to J. A. Plasterer & Son, and in accordance with the agreement, terminated said agreement as of April 16, 1953. Notice of intention to so terminate was properly given and duly received by J. A. Plasterer & Son on February 14, 1953.

7. During the term of the agreement, defendant erected on and in front of its place of business an approved Ford Dealer Sign, being a large oval sign, approximately five feet by three feet and ten inches thick, having the word "Ford" in script prominently displayed on both sides thereof in large white letters, said word "Ford" being illuminated by neon tube lights likewise in script and the entire sign being outlined with neon tube lights.

8. On numerous occasions since the termination of the agreement, officers, agents, employees or representatives of Ford Motor Company have requested, both orally and in writing, J. A. Plasterer & Son to remove the sign described in paragraph 7 in accordance with paragraph 10(c) of the agreement.

9. By May 7, 1954, J. A. Plasterer & Son had painted the word "Parts" in small white letters beneath the word "Ford" on said sign. The word "Parts" was not illuminated as such. By January 24, 1955, J. A. Plasterer & Son had attached a thin metal strip to the top of the sign described in paragraph 7 on which the word "Genuine" was painted in small white letters. The word "Genuine" was not illuminated as such.

10. Ford Motor Company, through its counsel, on May 4, 1956, offered to purchase from J. A. Plasterer & Son all new and undamaged genuine Ford parts and approved accessories purchased from the Company by J. A. Plasterer & Son after December 9, 1952 and prior to April 16, 1953, providing such parts and accessories are identifiable as such in accordance with paragraph 10(f) of the Sales Agreement and said offer was refused by J. A. Plasterer, Jr.

11. Earl B. Hoffman is the present Ford dealer in Highspire, a Ford Sales Agreement having been entered into between him and plaintiff sometime in May or June of 1953.

12. Hoffman's place of business is located in Highspire on the same street as that of defendant and three and one-half blocks away from it. In front of his place of business, Hoffman has an approved Ford Dealer Sign similar to that in front of defendant's place of business except that it has not been altered by the addition of any words.

### Discussion

Three hearings in this matter produced little more than a welter of con-

tradictions. Fortunately, the parties were able to agree on a few basic facts which were formalized by a Stipulation. Under date of August 8, 1940 the parties entered into an agreement captioned "Ford Sales Agreement." The obvious purpose of this agreement was to constitute the defendant a dealer of Ford cars and parts at Highspire, Pennsylvania. Plaintiff by due and proper notice dated February 9, 1953 terminated the said agreement as of April 16, 1953.

During the term of the agreement and in accordance with the provisions thereof, defendant purchased for $300., at its own expense, and erected at its place of business, an approved Ford Dealer Sign. Furthermore, during the term of the agreement, defendant acquired a large stock of parts which are the bone of contention that gives us this action.

Under the provisions of this agreement, which while bilateral in form certainly has definite unilateral overtones in favor of the plaintiff, plaintiff had the right to terminate the agreement as it did and to enter into another dealership agreement, which it did, for the small community of Highspire.[1]

I find nothing in the agreement which would indicate that Ford was under any obligation to purchase from Plasterer the sign on termination of the agreement. On the other hand, the agreement does specifically provide on termination of the agreement that "Company (Ford) shall repurchase immediately from Dealer (Plasterer) and Dealer agrees to sell to Company all new and undamaged genuine Ford, Mercury, Lincoln and Lincoln-Zephyr parts and approved accessories purchased from Company by Dealer after the sixtieth day prior to date of giving notice of intention to terminate this agreement at the prices paid for such parts by Dealer less ten per cent (10%) and less transportation charges thereon * * *."

Reminiscent of recent Congressional hearings in which the relations between the automobile manufacturers and their dealers were given wide publicity, there is in this case enough undisputed testimony to convince me of the existence here of a substantial amount of pressure salesmanship which did result in a heavily overstocked inventory of parts.

There was testimony in relation to the erection by dealer of a new garage and of dealer meetings in which assigned quotas of cars and parts were impressed on the dealers. This testimony was in part, at least, contradicted. However, the agreement did specifically require the Company to repurchase *immediately* all genuine parts and accessories purchased from Company by dealer after the sixtieth day prior to date of giving notice of intention to terminate the agreement. By the same provision of the agreement the dealer obligated itself to sell the said parts and accessories. Yet the Stipulation indicates that it was not until May 4, 1956 that the Company, through its counsel, offered to purchase from dealer all new and undamaged genuine Ford parts and approved accessories purchased from Company by dealer after December 2, 1952 and prior to April 16, 1953, provided such parts are identifiable in accordance with the terms of the agreement. It is significant in this connection that this action was instituted January 6, 1956, and the offer was not made by Company through its counsel until four months thereafter and less than one month short of three full years from the termination of the agreement.

As indicated above, regardless of the apparent imbalance in the content of the agreement in relation to the contracting parties, the fact remains that the defendant, as such dealer, did obligate itself to do certain things on the termination of the agreement. If with full

1. Bushwick-Decatur Motors, Inc., v. Ford Motor Co., 2 Cir., 116 F.2d 675.

knowledge of the existence in the agreement of the sort of sword of Damocles termination clause it acquired a large stock of parts and accessories, it did it knowing that when the sword fell it could only expect help from the Company for those parts and accessories purchased within the sixty day period prior to date of the notice of termination.

The Company had a perfect right to terminate the agreement and to designate a new dealer. The existence of two signs giving the unmistakeable impression of two authorized Ford dealers tends only to confusion and is unfair not only to the parties involved but to the public as well.

Plaintiff is seeking equity,—it must do equity. I am of the opinion that the plaintiff fell far short of meeting its patent responsibility at the time of the termination of the agreement. After a lapse of four years it will be much more difficult to determine the value of parts and accessories purchased by defendant which under the agreement plaintiff is obliged to repurchase but I feel that the failure of plaintiff to move immediately, as the agreement provided, is the primary cause in the creation of whatever difficulty presently exists. Defendant has a right to expect the plaintiff to repurchase those parts and accessories designated in the agreement. When that has been accomplished, defendant will be required to remove the sign.

Because of the conflicting equities final judgment in this matter will be deferred for a period of sixty days. During this period the parties will be expected to proceed according to the terms of the agreement and in line with the views herein expressed.

### Conclusions of Law

1. The Court has jurisdiction of the parties and of this action.

2. Final judgment in this matter will be deferred for a period of sixty days.